[Criminal No. 882.   Filed February 19, 1940.]

[99 Pac. (2d) 86.]

HAROLD KEYS, Appellant, v. THE STATE OF ARIZONA, Respondent.

Mr. Wm. J. Fellows, for Appellant.

Mr. Joe Conway, Attorney General, and Mr. Albert M. Garcia, Assistant Attorney General, for Respondent.

McALISTER, J., Dissenting.—Upon appeal to this court the conviction of Harold Keys for robbery was reversed in a unanimous opinion and the case remanded for a new trial. *Keys* v. *State, ante,* p. 24, 97 Pac. (2d) 736. The state moved for a rehearing and it was denied by a majority of the court on February 5, 1940, without comment. I dissented from this disposition of the motion and stated that my reasons would be filed later.

The conviction was reversed because of the misconduct the court held deputy sheriff, Vernon LaMore, and deputy county attorney, William T. Choisser, who prosecuted the case, were guilty of during the trial. The record discloses that at the beginning of the trial all of the witnesses, including LaMore, were sworn and placed under the rule and appellant contends, and the court so holds, that in disregard of the admonition to refrain from discussing the case with anyone La-More talked to Merla Hartley about the testimony she gave the first day of the trial and induced her to change

it the following day by permitting or helping her to be alone in jail with her boy friend, Mickey Warthon, at least a part or all of the night of April 19, 1939. The charge made against Choisser and upheld by the court is that he, knowing LaMore was under the rule, permitted or tacitly approved his violation of it in the manner stated.

Four men and two women committed the robbery and five of these were apprehended within a few days thereafter, but Keys was not found until a month later. The three men pleaded guilty and were given heavy sentences in the state prison, but Keys pleaded not guilty, and his associates in the crime, having been brought from the prison as witnesses for him, were held in jail while in Phoenix. Late in the afternoon of the first day of the trial the state placed one of the two women, Merla Hartley, on the stand and, instead of testifying as the prosecution expected, she denied that the Keys on trial had anything to do with the robbery but testified that it was another man by that name that took part in it. The prosecution permitted her to leave the stand without expressing surprise or challenging her testimony. The next day she was called again and testified that appellant Keys was one of the participants in the robbery and that her testimony to the contrary the day before was false. Upon cross-examination appellant's counsel endeavored to show that she had been induced to change her testimony by asking questions intended to establish the fact that she agreed to do this if she were permitted to spend the night or part of it alone in jail with her boy friend, Mickey Warthon. After stating she did not know that the visiting hours in jail on Wednesdays were from nine to four, she gave the following testimony:

"Q. You were there last night, weren't you? A. I was in the county jail all last night.

"Q. And you saw and was with Mickey? A. Yes.

"Q. Who permitted you and Mickey to be together last night? A. I don't know who permitted me to see him."

She then stated that she asked several persons, including LaMore, deputy sheriff Roach and the jail matron, if she could see Mickey, and in reply to the question, "And the price you paid was to come in here and change your testimony, wasn't it?" she answered "No, it wasn't."

Following her Vernon LaMore was called by the state for the purpose of identifying a gun in connection with the robbery, whereupon appellant's counsel cross-examined him as to what was said between him and Merla Hartley after she left the stand the first afternoon. It appears that he spoke to her about Mickey and, in reply to her request to see him, told her that it might possibly be arranged, but to the question intended as a completion of his statement to her, "Provided she testified a certain way?" he answered "No." He testified further that Merla Hartley had talked to him several times about the case, that she had identified Keys' picture, mentioned his nickname "Pumpkin" and that on one of these occasions had given the facts in the case to the court reporter in the presence of one or two persons, including himself. He felt sure, he stated, that she knew Keys, so in the presence of Choisser he asked her why she did that, that is, change her testimony, and she said she felt bad about it but that she did it because she felt angry about the amount of time given her boy friend Mickey and that she thought three of them were enough to pay for the crime. Replying to the question by appellant's counsel, "You didn't tell her at that time you would prosecute her in this case if she didn't come across?" he stated, "I didn't tell her that" and to the

question, "Did anyone in your presence?" he answered, "I didn't hear it."

So, as I see it, the record does not by any means lead necessarily to the conclusion that Merla Hartley changed her testimony because she was permitted to be alone in jail with Mickey Warthon during the night of April 19, 1939, or any part of it. The portion relied upon for this purpose is her statement: "I was in jail all last night" and her answer, "Yes" to the question, "And you saw and was with Mickey." However, her reply, "I don't know who permitted me to *see* him" to the question, "Who permitted you and Mickey to be together last night?" indicates, it occurs to me, that if her answers to the two preceding questions were subject to the interpretation contended for by appellant and upheld by the court, any thought that she was with Mickey alone in the jail that night or any part of it was not in her mind, but only that she saw him. And, besides, it must be remembered that before anything of the nature of what appellant attributes to her and her boy friend could take place in the jail, it would be necessary for those in charge to consent and certainly it should not be presumed for a moment, in the absence of proof to that effect, that they would for one moment stand for such conduct.

The trial court struck the evidence of LaMore and Merla Hartley because it felt that the former had violated the rule in discussing the case with the latter and it does not appear from the language used by it at the time that the nature of the conversation had anything to do with its action. Had it thought that LaMore had induced Merla Hartley to change her testimony in the manner suggested, and that this had been done with the tacit understanding of Choisser, I feel sure, from my knowledge of the judge who sat in this case, that he would not have stopped with merely strik-

ing their evidence but would have dealt with them in the way such action would have merited.

If, however, it may reasonably be contended from the record brought to this court that LaMore, with the knowledge or tacit approval of Choisser, did arrange for Merla Hartley to be in jail alone with Mickey Warthon during the night of April 19, 1939, for the purpose of inducing her to change her testimony, it is clear from the affidavits submitted by the state in connection with the motion for rehearing that there was absolutely no basis in fact for such a conclusion. These affidavits were made by Gene McLain, a newspaper reporter, Albert Robbins, jailer, Vernon LaMore and William T. Choisser, and it appears in substance from them taken together that on April 19, 1939, after Merla Hartley had denied on the witness stand that she knew appellant Keys, deputy county attorney Choisser ordered deputies sheriff LaMore and Roach to arrest her and place her in jail, stating to them that he was going to file a perjury charge against her the next morning; that about 7 o'clock that evening Choisser, accompanied by LaMore and Roach, visited the jail and had a conversation with her; that while there she expressed a desire to see Mickey Warthon and at the request of Choisser the jailer took her from the women's ward and Warthon from tank ''A'' of the men's ward to the public corridor of the jail where they talked for about twenty-five minutes in the presence of numerous people, including Choisser, LaMore and Roach; that after their conversation they were returned to their respective wards, which are separated by the corridor, and remained there during the night. In the light of these facts it is perfectly plain that Merla Hartley's answer ''Yes'' to the question, ''And you saw and was with Mickey?'' was correct and that she meant by it that she was with him for about twenty-five or thirty minutes in the corridor of the jail

in the presence of other persons. This meaning was evidently so manifest to the prosecutor that it never occurred to him that appellant's counsel or anyone else would ever attempt to construe it to mean that she was with him alone in the county jail that night. If he had thought it susceptible of this construction, he could and evidently would have removed all doubt by merely asking her to state in what particular portion of the jail they were together, in whose presence, and for what length of time. And the fact that he did not do this is, to my mind, positive proof that no such thought ever occurred to him.

My associates are of the view, however, that the affidavits should not be received or considered. This would be true if they had been submitted for the purpose of persuading the court, in disposing of the motion for rehearing, to reverse the action already taken by it, for it could not have considered them for that purpose, since appeals are determined on the record brought here from the trial court and rehearings upon the one used in deciding the appeal originally. They were not offered, however, to accomplish this end but to inform the court of the actual facts relative to the alleged misconduct of a member of the bar of this state and a deputy sheriff in order that it might know that it had unintentionally done them a serious injustice in holding them guilty of conduct reprehensible in the highest degree, when there was in fact absolutely no basis for doing so. To my mind there is no question of the court's right to consider the affidavits to determine whether it had inadvertently but nevertheless unjustly censured Choisser and LaMore. It had full control of this matter and could of its own motion and in the exercise of its inherent power do this, or whatever else might be necessary, to right this wrong. If the affidavits did not satisfy it as to the actual facts, it could, and in view of the fact that they put it on no-

tice of such injustice, should have caused it to order further inquiry. It would be a sad comment on the judicial procedure of this state to hold the court powerless in such a situation.

That LaMore and Choisser were guilty of extremely reprehensible conduct has become a permanent record by the appearance of the holding to this effect in the reports of the decisions of this court and, notwithstanding the fact that the affidavits disclose that there is not the slightest basis for the charge, they are helpless to correct it, but must endure and suffer the consequences flowing therefrom throughout the remainder of their lives. Hence, I welcome this opportunity to do what lies within my power to correct this injustice for which I was in part responsible.

As I see it, the judgment of the trial court should be affirmed, but regardless of this Choisser and LaMore, not being guilty of the misconduct attributed to them, should be relieved of that accusation.